Richard A. Solomon, SBN 82923
SOLOMON, GRINDLE, SILVERMAN & WINTRINGER, APC
A Professional Corporation
12651 High Bluff Drive, Suite 300
San Diego, California  92130
TEL: (858) 793-8500
FAX: (858) 793-8263

Attorneys for Secured Creditor, PNC BANK, N.A., successor-in-interest to NATIONAL CITY BANK, its successors and/or assigns

# UNITED STATES BANKRUPTCY COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>　　GEORGE THOMAS HALE, III and<br>　　LONE HALE,<br><br>　　　　Debtors, | Case No: 10-06988-LA13<br><br>Chapter 13<br><br>Hon. Louise DeCarl Adler<br><br>**DECLARATION OF PNC BANK, N.A. IN SUPPORT OF OPPOSITION TO DEBTORS' MOTION FOR ORDER STRIPPING JUNIOR DEED OF TRUST**<br><br>Hearing on Motion:<br>Date:　August 10, 2010<br>Time:　11:00 a.m.<br>Dept:　1 |

I, Julian Hall, declare

　　　1.　　I am employed by PNC BANK, N.A., successor-in-interest to NATIONAL CITY BANK, its successors and/or assigns ("PNC Bank").  In that capacity, I have been charged with the responsibility for handling the collection of certain loans possessed by PNC Bank.  I am the employee of PNC Bank who is primarily responsible for securing payment of PNC Bank's loan to the Debtors, GEORGE THOMAS HALE, III and LONE HALE ("Debtors").

///

///

---

1
**DECLARATION OF PNC BANK, N.A. IN SUPPORT OF OPPOSITION TO DEBTORS' MOTION FOR ORDER STRIPPING  JUNIOR DEED OF TRUST**

2. I have custody and control of PNC Bank's business records and documents relating to its loan to Debtors. These records were prepared in the regular course of PNC Bank's business at or near the time of the act, condition, or event to which they relate. Such records were prepared in the ordinary course of business by PNC Bank by a person employed by PNC Bank who has personal knowledge of the event being recorded and who has a business duty to PNC Bank to make a record of such event.

3. All matters contained herein are based upon my personal knowledge and/or personal review of the business records of PNC Bank. If called as a witness, I could and would competently testify thereto.

4. On or about March 6, 2006, Debtors entered into an Equity Reserve Agreement - National Home Equity Agreement ("Note") with PNC Bank, wherein Debtors received an open end revolving line of credit with a maximum limit of $270,000.00. A true and correct copy of the Note is attached hereto, marked as **Exhibit "A"** and is incorporated herein by this reference.

5. On November 7, 2009, National City Bank was acquired by PNC Bank, N.A., which is a member of the PNC Financial Services Group, Inc., a publically traded company on the New York Stock Exchange (NYSE.PNC). Attached hereto collectively marked as **Exhibit "B"** is a copy of the merger document and a copy from the National Information Center, a repository of financial data and institution characteristics collected by the Federal Reserve System, that evidences the merger.

6. Pursuant to the Note, Debtors agreed to pay for advances of credit extended by PNC Bank, with interest thereon at the annual percentage rate of 7.250%.

7. To secure repayment of the Note, Debtors granted to PNC Bank a beneficial interest under a second priority Deed of Trust ("Deed of Trust"). The Deed of Trust encumbers residential real property located at 1141 Welsh Way, Ramona, California, 92065 (the "Property"). The Deed of Trust was recorded on March 27, 2006 in the Official Records of San Diego County as Instrument No. 2006-0208453. A true and correct copy of the Deed of Trust is attached hereto, marked as **Exhibit "C"** and is incorporated herein by this reference.

8. On or about March 3, 2010, Debtors defaulted under the Note by failing to make the monthly payment owed to PNC Bank on that date, and all subsequent payments due thereafter. As a result of said default, the principal sum of $227,931.17, plus accrued interest, late charges, attorneys'

fees and other costs, is now all due and payable.

9. Debtors' Motion alleges that the subject Property value is $329,000.00.

10. I am informed and believe that the encumbrances against the Property are as follows:

(i) A First Deed of Trust in favor of BAC Home Loans Services securing an approximate principal obligation of $341,255.00.

(ii) A Second Deed of Trust in favor of PNC Bank securing an approximate total obligation of $227,931.17.

11. PNC Bank has submitted the declaration of an independent real estate Broker, Jeff Foster, filed concurrently herewith, which establishes a value of $470,000.00 for the Property as of May 17, 2010. Given this competing evidence, PNC Bank submits that there is likely to be at least $1.00 of equity in the Property to preclude Debtors efforts to avoid PNC Bank's lien.

I declare under penalty of perjury of the United States of America that the foregoing is true and correct, and as to those matters testified to on information and belief, I believe them to be true.

Executed this 23 day of July, 2010, Brecksville, Ohio.

_____, Declarant

3
DECLARATION OF PNC BANK, N.A. IN SUPPORT OF OPPOSITION TO DEBTORS'
MOTION FOR ORDER STRIPPING JUNIOR DEED OF TRUST

| National City. | EQUITY RESERVE℠ AGREEMENT – NATIONAL HOME EQUITY |
| --- | --- |
| | (Not to be Used for Lines Secured by a Texas Homestead) |
| | Date: 3/06/2006    Account No. █████6418 |

You, the undersigned, are opening an Equity Reserve Line of Credit (Line) with National City Bank (Bank) and agree that the following material terms and conditions will apply to your Line.

**Line of Credit.** Your Line is an open-end line of credit which you may use to obtain cash advances (Advances) from time to time for a period of 10 years (9 years 10 months in Connecticut) (Draw Period). If you continue to meet Bank's then current credit and collateral value criteria, at Bank's discretion, Bank will either extend the Draw Period for one or more additional Draw Periods or Bank may refinance your Line on the terms then being offered by Bank for Equity Reserve Lines of Credit. If your Draw Period is not renewed or the Line refinanced, you may repay any outstanding balances during the Repayment Period as provided in the Payment section below.

The initial amount of your Line is $ 270,000.00 (Credit Line). You have the option anytime during the Draw Period of this Agreement to create Fixed Rate Locks of all or part of your Line at a fixed rate and for a fixed payment. The Fixed Rate Lock (FRL) balance includes the FRL advance fee. Any amount you repay on the Line and/or on an FRL will be again available to you on the Line until the end of the Draw Period. Bank may reduce the amount of your Credit Line under certain conditions described in this Agreement.

**Advances.** You may obtain Advances under your Line by issuing Equity Reserve checks and special FRL checks (each a Check) supplied by Bank, by contacting Customer Service or by way of any other Bank approved plan. Bank will charge your Checks directly against your Line. You may make arrangements for an Advance on your Line to pay off any FRL at any time by contacting Customer Service at the address or phone number on your statement. You should notify Bank when you need more Checks. The minimum FRL Advance that you can receive using an FRL Check is $5,000. FRL Check Advances will automatically have a 20-year Repayment Term. You may contact Customer Service after a FRL Check posts to your Line to change the Repayment Term to one of the other available terms listed in the Fixed Rate Lock Advances section below, however, FRL Advances changed to another Repayment Term will be subject to finance charges at the annual percentage rate in effect the day the new FRL Repayment Term is applied by Customer Service. FRL Advances for terms other than 20 years may also be obtained by contacting Customer Service instead of by Check. FRL Checks for less than $5,000 will be posted as a Line Advance. You should also notify Bank immediately if your Checks are lost or stolen. (Please see the "Stop Payment Orders" section of this Agreement). Your statement will list Checks that have been paid, but the actual paid Checks will not be returned to you. You may request copies of paid Checks from the Bank, and a copying fee may be charged.

Bank will issue you a Card or Cards for use with the Line except in Connecticut, New York and Texas and in other states where such access is limited. The word Card can mean one or more credit cards or Automated Teller Machine (ATM) cards. You authorize Bank to issue you a Card for use with the Line. You may purchase goods or services from merchants who honor the Card. You may obtain Advances from Bank or any other financial institution that honors the Card. You may also obtain Advances by using a Personal Identification Number (PIN) for telephone banking or on-line banking Advances. Bank will charge all Advances to your Line.

If you allow someone else to use your Card or PIN and you want to stop such use, you must let Bank know in writing. You must notify Bank immediately if your Cards or PIN are lost or stolen, or you believe that some person may be using your Card(s) or PIN without permission. You will not use your Line after notifying Bank of loss, theft or unauthorized use of your Card(s) or PIN. You will not be held liable for any unauthorized use of the Card or PIN after you have notified Bank of the loss or theft by phone at 1-800-533-6596 or in writing at National City Card Services, P.O. Box 4092, Kalamazoo, Michigan 49003 (Otherwise you may be liable, but not for more than $50.) Bank may terminate the use of your Card, PIN or Checks if you lose your Card, PIN or Checks two times or more in a twelve-month period. Bank may also terminate the use of your Card or PIN if your new balance exceeds your Credit Line by 2% or if you are over limit for more than one billing cycle.

Bank will have no obligation to honor any Advance by any means if the resulting new balance of your Line would exceed your Credit Line; or after the Draw Period ends; or in the event of termination or suspension of your Credit Line under the conditions described in this Agreement, and upon Bank's request you will return Checks and/or Cards. Your Line may not be used for Internet lottery, betting or gambling transactions or for any illegal transactions.

Charges from foreign merchants and financial institutions may be made in a foreign currency. Bank will bill you in U.S. Dollars based on the exchange rate on the day Bank settles the transaction, plus any special currency exchange charges. In the case of VISA Accounts, the exchange rate applied to each such transaction is a rate selected by Visa from a range of rates available in wholesale currency markets for the applicable central processing date, which rate may vary from the rate Visa itself receives, or the government-mandated rate in effect for the applicable central processing date. In addition, Bank will charge a foreign transaction fee of 1% of the converted amount. Because of the special charges and possible differences in exchange rates between the time Bank settles and the time you initiated the transaction, the total charge for a foreign transaction may be greater than the cash advance or purchase at the time it was made.

**Finance Charge for Line and Fixed Rate Lock Advances and During the Repayment Period.**
a) **Line Advances:** Bank figures the finance charge on your Line by applying the periodic rate to the "average daily balance" of your Line. To get the "average daily balance", Bank takes the beginning balance of the Line each day, adds any new Advances including if applicable, the broker and processing fees, and other debits, and subtracts any payments or credits and unpaid periodic finance charges. This gives the daily balance. Then, Bank adds up all the daily balances for the billing cycle and divides the total by the number of days in the billing cycle. This gives the "average daily balance".

Advances are subject to finance charges from the date of transaction to the date payment is posted to the Line. The periodic rate of finance charge and the annual percentage rate are subject to change, based on the value of an index. The index in effect for each billing cycle shall be the "Prime Rate" of interest appearing in the Money Rates Table of The Wall Street Journal published on the first day of your Billing Cycle (or, if not published on that date, the last edition published prior to that date), rounded upward, if necessary, to the nearest .01% (Line Index).

The **ANNUAL PERCENTAGE RATE** is the Line Index plus (0.250)   %(Line Margin). The **FINANCE CHARGE** for each billing cycle shall be computed at the annual percentage rate divided by 12. As of    02/27/2006   , the current periodic rate of **FINANCE CHARGE** is    0.604   % per month, which corresponds to an **ANNUAL PERCENTAGE RATE** of 7.250%.

The annual percentage rate and the periodic rate of finance charge may increase if the Line Index increases. In the event of an increase, the finance charge will increase and the minimum payment amount may increase. If the minimum payment amount is either 1.5% of the new balance or the total finance charges, an increase or decrease in the annual percentage rate will result in a corresponding increase or decrease in the minimum payment amount.

b) **Fixed Rate Lock Advances:** Bank figures the finance charge on each FRL by applying the periodic rate to the "average daily balance" of the FRL. To get the "average daily balance", Bank takes the beginning balance of the FRL each day and subtracts any payments or credits and unpaid periodic finance charges. This gives the daily balance. Then, Bank adds up all the daily balances for the billing cycle and divides the total by the number of days in the billing cycle. This gives the "average daily balance".

Each FRL is subject to finance charges from the date of the transaction until paid in full. The periodic rate of finance charge and the annual percentage rate are determined and fixed on the business day the transaction posts to your Line. The index shall be the highest daily rate for 3 year Treasury notes with constant maturities from the 1st business day through the 11th last business day of the calendar month preceding the month in which the transaction posts to your Line, rounded, if necessary, to the nearest 0.125% (FRL Index). The FRL Index can be found in the Federal Reserve Statistical Release H.15 at www.federalreserve.gov/releases/h15.

EXHIBIT A

NHERA1 (06/13/2005)        

ERA-MULTI-NHV2_1

The **ANNUAL PERCENTAGE RATE** is the FRL Index plus a margin (FRL Margin). The **FINANCE CHARGE** for each billing cycle shall be computed at the annual percentage rate divided by 12. As of    03/06/2006    , the FRL Margin, the current periodic rate of **FINANCE CHARGE** per month and corresponding **ANNUAL PERCENTAGE RATE** for each FRL Repayment Term are listed in the table below:

| FRL Repayment Term | FRL Margin | Monthly Periodic Rate of FINANCE CHARGE | ANNUAL PERCENTAGE RATE |
|---|---|---|---|
| 5-year FRL: 60 monthly payments | 3.250 | 0.656 | 7.875 |
| 10-year FRL: 120 monthly payments | 3.500 | 0.677 | 8.125 |
| 15-year FRL: 180 monthly payments | 3.750 | 0.698 | 8.375 |
| 20-year FRL: 240 monthly payments (automatic term for FRL checks you write) | 4.250 | 0.740 | 8.875 |
| 7-year "Interest Only" FRL: 83 monthly payments of one penny plus finance charges on the FRL balance (including the FRL Advance Fee), followed by a balloon payment of the remaining balance in the 84th month. | 3.500 | 0.677 | 8.125 |

    c) **Both Line and Fixed Rate Lock Advances:** In no event shall the periodic rate of **FINANCE CHARGE** be more than 1.50% per month or less than 0.25% per month and in no event shall the **ANNUAL PERCENTAGE RATE** be more than 18.00% or less than 3.00%. The annual percentage rate includes only interest and not other costs. Your monthly statement will disclose the applicable annual percentage rate for the billing cycle.

    d) **Repayment Period.** Any amount outstanding other than FRL's will be converted to a Fixed Rate Lock balance on the last business day of your Draw Period and will be subject to finance charges for a Fixed Rate Lock based on a 240 month Repayment Term for balances of $10,000 or more or a 120 month Repayment Term for balances of less than $10,000 as stated in subsections (b) and (c) above. The index value is the highest FRL Index from the 1st business day through the 11th last business day of the calendar month preceding the month in which the Draw Period ends, rounded, if necessary, as provided in subsection (b) above.

Other Finance Charges.    A Broker fee **FINANCE CHARGE** of $    0.00
    A Discount Fee **FINANCE CHARGE** of $    0.00    (0.000 % of Credit Line)
    A Processing Fee **FINANCE CHARGE** of $    0.00
    An FRL Advance Fee **FINANCE CHARGE** of $50 for each Fixed Rate Lock used.

**Other Charges.** In addition to finance charges, the following other charges will apply:

- An annual fee of $50 reflected on the monthly statement for the first billing cycle of each year of your Draw Period beginning with the 13th billing cycle, whether or not you obtain Advances under your Line. This fee is not refundable.
- A late payment fee of the greater of 10% of the unpaid minimum payment or $40, if Bank does not receive your minimum payment at the address shown on your statement within 10 days of the Due Date. Bank may charge an additional late payment fee for each billing cycle that your Line is past due.
- An overlimit fee of $25 whenever you go over your Credit Line. Bank may charge an additional $25 for each billing cycle that you remain over your Credit Line.
- A returned payment fee of $30 if you make a payment on your Line which is returned to Bank unpaid because of insufficient funds, a closed account, stop payment, or any other reason.
- A returned check fee of $30 if you write a Check that Bank dishonors under the "Advances" section of this Agreement.
- A stop payment fee of $30 for the service of stopping payment on a Check and a $30 service fee for renewal of each stop payment order.
- A foreign transaction fee of 1% of the transaction amount. This fee is not applicable to transactions in the United States.
- An early termination fee of $    0.00    if you close your Line within the first 36 months.
- A document request fee of $6 per copy for service of providing copies. Bank will not charge you for documents Bank is required by law to give you at no charge.
- Any real estate related closing fees due at the closing of your Line as reflected on the HUD1 settlement statement provided to you by the closing agent which is hereby incorporated and made part of this Agreement by this reference.

Bank does not lose any of its other rights under this Agreement whether or not it charges late payment or overlimit fees. You also agree that Bank may also charge you a fee, not otherwise enumerated herein, for services that Bank performs for you that you have requested. The application of any fee shall not cure the default which initiated the fee.

**Security Interests.** Your Line will be secured by a mortgage (Mortgage) on your dwelling (Dwelling). If the Dwelling is your primary or secondary residence, you represent and warrant to Bank that at all times during the term of this Agreement your Dwelling, or a minimum of one unit of your multi-unit Dwelling, shall be occupied by you and shall not be used as rental property. Bank agrees to waive any security interest in the Dwelling to the extent it secures Advances which may be in excess of your Credit Line. You name Bank as loss payee and beneficiary of the proceeds of, and assign to Bank any unearned premiums of, all insurance connected with your Line. You must not adversely affect Bank's interest in the Dwelling by any action or inaction. You must keep the Dwelling in good condition, promptly pay all mortgages and other liens against the Dwelling, and promptly pay all taxes and assessments on the Dwelling. You must not sell or transfer title to the Dwelling without Bank's permission, or use the Dwelling for any illegal purpose.

**Property Insurance.** You must keep the Dwelling fully insured against loss or damage on terms that are acceptable to Bank to the extent permitted by law. You must carry flood insurance if required by federal law. You may obtain property insurance or furnish existing property insurance from anyone that is acceptable to Bank provided the insurer is authorized to do business in the state or jurisdiction where the Dwelling is located or is an eligible surplus lines carrier. You agree to furnish Bank with written evidence of such insurance, with Bank named as loss payee and proof of payment of insurance premiums. If you fail to do so, Bank may buy insurance to protect Bank's interest and add the premium cost to the unpaid balance of your Line, subject to the same finance charges as Advances against your Line. You assign to Bank the proceeds from any such insurance policies up to the unpaid balance of your Line. Bank may apply such proceeds, including any return of unearned premiums and payments for claims under such policies, to reduce the unpaid balance of your Line. You irrevocably authorize Bank as your agent and on your behalf to negotiate, settle and release any claim under your insurance and to submit insurance claims for you and to receive and sign your name to any checks or drafts or related papers obtained from insurance companies.

**Tax Deductibility.** You should consult a tax advisor regarding the deductibility of interest and charges on your Line.

**Statements.** Bank agrees to mail or deliver to you a monthly statement for each billing cycle at the end of which there is a balance which is a debit or credit balance of more than $1 or on which a finance charge has been imposed. The balance is the sum of all outstanding Advance(s), fees, payments, other credits, other charges and debits, and finance charge(s).

-2-



**Payments.** Your payments will be due monthly. You may pay the entire unpaid balance of your Line and/or your FRL(s) at any time. You are required to pay a minimum payment by the Due Date shown on your statement equal to the sum of the Line Minimum Payment and the FRL Minimum Payment for each FRL in use.

        a) **Line Minimum Payment:** The Line Minimum Payment will equal the periodic finance charges that accrued on the outstanding Line balance during the preceding billing cycle as shown on each monthly statement (Interest Only Minimum Payment).

        b) **The FRL Minimum Payment is:** For all FRL's except the 7 year "Interest Only" FRL, the minimum payment is a fixed payment amount that is sufficient to pay off the FRL including the FRL Advance Fee, at the fixed rate applicable to that FRL calculated based on the number of monthly payments for the applicable FRL Repayment Term as described in the section of this Agreement called "Fixed Rate Lock Advances." If you choose the 7-year "Interest Only" FRL option, the minimum payment is 83 payments of one penny ($.01) plus the finance charges that accrued on the outstanding FRL balance which balance includes the FRL Advance Fee, at the fixed rate applicable to that FRL (as described in the section of this Agreement called "Fixed Rate Lock Advances") during the preceding billing cycle as shown on each monthly statement followed by one payment of the outstanding balance. Any amount still owing at the end of the billing cycle prior to the billing cycle containing the final payment will be added to the final minimum payment due. Additional payments on any FRL may be made at any time but you will continue to be obligated to make the fixed payment for the FRL as long as any amount is still owing on the FRL. The amount of any reduction in principal from a payment on an FRL will become available to you on your Line once it is posted, until the end of the Draw Period. If your Draw Period is not renewed then access to the Line will not be available during the Repayment Period.

        c) **Repayment Period:** The Minimum Payment may not fully repay the principal that is outstanding by the end of the Draw Period. If your Draw Period is not renewed for an additional term, during the Repayment Period you may continue to make scheduled payments on any FRL balances outstanding at the end of the Draw Period until they are paid in full. Additionally, any amount outstanding other than an FRL will be converted to a Fixed Rate Lock without an FRL Advance fee on the last business day of your Draw Period and will be subject to then current finance charges for an FRL of equal Repayment Term as described in the section of this Agreement called "Fixed Rate Lock Advances." The total amount will be required to be repaid in two hundred forty (240) equal monthly payments for balances of $10,000 or more; or one hundred twenty (120) equal monthly payments for balances of less than $10,000. Any amount still owing after two hundred thirty nine (239) billing cycles or after one hundred nineteen (119) billing cycles respectively, will be added to the final minimum payment due.

Payments will be applied in the following order: First, to each FRL on a first in-first out basis for all unpaid periodic finance charges and then to the FRL's principal balance in an amount necessary to amortize the FRL within its amortization schedule, then to all unpaid periodic finance charges on the Line, then to all Other Charges, then to the Line. For introductory and promotional offer balances, payments to the Line are applied on the basis of the lowest rate balance first to highest rate balance last. If there are no balances on the Line, overpayments are applied as a prepayment to the FRL(s) on a first in-first out basis. If there are no balances on any FRL or on the Line, overpayments are credited to the Line and returned upon request. In order to make additional partial prepayments to an FRL or to prepay an FRL in full without paying off your Line, you must contact Customer Service to make arrangements to do so.

**Stop Payment Orders.** We agree to honor a stop payment order against a Check when received from you within a reasonable time prior to payment. A stop payment order becomes effective after we have actually received the order and had a reasonable time to process it, and the order will remain in effect for thirteen months. Our acceptance of a stop payment order does not mean that the Check has not yet been paid, and we shall have no liability resulting from the payment of a Check before your stop payment order becomes effective. A stop payment order may be renewed for successive periods equal to its original period of effectiveness if we receive a renewal notice prior to the order becoming ineffective.

A stop payment order against a Check must accurately describe it as to date, number, amount, and payee, and must correctly recite your name and the Account number. You agree that it is current industry standard to process stop payment orders by means of computer technology. Accordingly, your failure to provide the exact identification of Account number and Check number in order to identify the Check to be stopped will result in the Check being paid if presented, and we will not be liable for such payment. Errors in your name or the Account number, or inaccuracies in the description of the number, amount, issue date or payee on your written stop payment order shall relieve us from any liability for any mistaken payment or wrongful dishonor. Any errors on our written acknowledgment to you of a stop payment order must be reported by you in writing to our Customer Service Department within 10 calendar days of the written acknowledgment date. We shall not be liable for any mistaken payment or wrongful dishonor occurring after the 10-day period, unless errors or inaccuracies are so reported to us within the 10-day period.

Before we will release a stop payment order, our Customer Service Department may require the receipt of a written request, signed by you, requesting the withdrawal of the order.

In the event we recredit the Account for a paid Check, then you hereby assign to us all rights against third parties. You or any joint account holder may order a stop payment. You agree that we will not be obligated to reimburse you immediately upon notice of alleged wrongful payment; that it is your obligation to prove the fact and amount of damage suffered; and that in no case will we be liable for more than your actual damage.

We shall not be liable for any damages unless we have failed to act in good faith and exercise ordinary care. You agree to indemnify us and hold us harmless from any and all expenses incurred or damages suffered by us in honoring a stop payment order.

To place a stop payment order, write to National City, Equity Reserve Stop Payment Department, 4661 E. Main Street, Columbus, Ohio 43251-0928.

**Termination of Line.** Bank can terminate your Line and require you to pay the entire outstanding balance in one payment if you breach a material obligation of this Agreement in that:
- You engage in fraud or material misrepresentation in connection with your Line.
- You do not meet the repayment terms of this Agreement.
- Your action or inaction adversely affects the collateral or Bank's rights in the collateral.

To the extent permitted by 11 USC 506, Bank shall be entitled to reasonable court costs and attorneys' fees for independent counsel that Bank hires (unless you are a resident of New Hampshire, in which case we may not recover our attorneys' fees from you). Interest after termination, whether prior to or after judgment by a court of competent jurisdiction, shall accrue upon the outstanding unpaid balance at the rate determined under this Agreement until such balance is paid in full.

**Suspension or Reduction of Credit Line.** Bank can refuse to make additional extensions of credit or reduce your Line if you breach a material obligation of this Agreement in that:
± The value of the Dwelling securing your Line declines significantly below its present appraised value for purposes of the Credit Line.
± Bank reasonably believes you will not be able to meet the repayment requirements due to a material change in your financial circumstances.
± You are in default of a material obligation under this Agreement.
± Government action prevents the Bank from imposing the annual percentage rate provided for or impairs the Bank's security interest such that the value of the interest is less than 120 percent of the Credit Line.
- A regulatory agency has notified the Bank that continued Advances would constitute an unsafe or unsound practice.
- The maximum annual percentage rate is reached.

If your Line is suspended and you have used any FRL(s) then at Bank's option Bank may terminate the FRL(s) and transfer any FRL balances to your Line.

Bank will give you written notice of any such action and conditions for reinstating your credit privileges. Bank may reinstate your credit privileges when the conditions leading to suspension are cured to Bank's satisfaction. Bank may require you to request reinstatement of credit privileges when the conditions leading to suspension or reduction of your Credit Line no longer exist. An additional title examination and other documentation may be required to reinstate your Line, and any costs associated with reinstatement will be paid by you where permitted by law.

NHERA3 (Rev 06/13/05)    -3-     ERA-MULTI-NHV2_3

**Change in Terms.** Bank may change certain terms of this Agreement at any time by giving you 15 days prior notice:
- The index and margin used for this Line if the original index is no longer available.
- A change that you specifically agree to.
- A change that benefits you.
- An insignificant change.
- Other changes permitted by applicable law

Any change in terms will apply to balances outstanding on the effective date of the change as well as to balances generated thereafter

**Other Provisions.** You shall promptly notify Bank of any change in circumstances which has a substantial adverse effect on your credit. You will furnish Bank with financial statements in a form satisfactory to Bank as Bank may request from time to time. Bank may also require a title examination and/or appraisal from time to time, the cost of which will be paid by you.

If this Agreement is signed by more than one borrower, each of you may draw Checks on the Line or use the Cards, and each and every borrower is jointly and severally liable for all Advances and charges on the Line. With reasonable notice to process the request, any of you may direct Bank to not make further Advances on the Line, however, reinstatement will only be made on the joint request of all of you;

Your rights in your Line may not be assigned. The Mortgage may not be assumed by a subsequent purchaser of the Dwelling. All fees paid to Bank are not refundable.

All of Bank's rights under this Agreement are valid to the extent permitted by applicable law. If it is determined for any reason that any part of this Agreement is invalid or unenforceable, this shall not affect the validity or enforcement of any other provision, and this Agreement will then read as if the invalid or unenforceable part were not there

Bank may delay exercising any of its rights under this Agreement without losing them. We may accept late payments or partial payments without losing any of our rights. **If your payment is marked with the words "Paid in Full" or similar language, you must send your payment to National City, 6750 Miller Road, Brecksville, Ohio 44141, Locator No. 7107** If your payment is made to any other address, we may accept the payment without losing any of our rights.

You understand that Bank is a national bank located in Ohio, and that Bank's decision to extend the Line to you was made in Ohio. Therefore, this Agreement and your use of the Line, Checks and Cards, shall be governed by and construed in accordance with (a) Federal laws and regulations including but not limited to 12 USC § 85 and (b) the laws of Ohio, to the extent Ohio laws are not preempted by federal laws or regulations, and without regard to conflict of law principles.

The annual IRS Form 1098 will be issued only to the first borrower listed on this Agreement at origination and the designation of a borrower as first cannot be changed subsequently.

At Bank's option, Bank may designate an electronic or optically imaged reproduction of this Agreement or any other document related to your Loan as an original document and if it does so, the reproduction may be relied on in full by all parties to the same extent as an original.

You can change any term of this Agreement only in a writing signed by us.

You agree that, to the extent not prohibited by applicable law, Bank shall not be liable for any damages unless Bank has failed to act in good faith and exercise ordinary care. You further agree that in no event shall Bank be liable for any consequential, indirect or special damages even if Bank has been advised of the possibility of such damages.

From time to time, we may offer you special rates for balance transfer transactions or introductory or promotional offers on your Line. If we do, we will advise you of the annual percentage rates and finance charges associated with the special rate offer, how long they will be in effect, the balances to which they will apply, and other terms of the special rate offer. Any special rate offer will be subject to the terms of the offer and this Agreement.
Bank may provide to others, including but not limited to, consumer credit reporting agencies, information about our transactions and experiences with you. Also, Bank and its affiliates (collectively "National City") may share with each other all information about you that National City has or may obtain for the purposes, among other things, of evaluating credit applications. **Under the Fair Credit Reporting Act there is certain credit information that cannot be shared about you (unless you are a business) If you tell National City by writing to National City Corporation, Attention: Office of Consumer Privacy, P O. Box 4068, Kalamazoo, MI 49009. You must include your name, address, Line (account) number and social security number.**

You agree that you and Bank have an established business relationship and that, to the extent not prohibited by applicable law, National City may contact you to offer you products and services that National City thinks may be of interest to you. Such contacts are not unsolicited, and National City may contact you by telephone and with an automated dialing and announcing device or by fax at any telephone number you have given to us including the telephone number on your application, or by email or other form of electronic communication and we may monitor telephone calls with you to assure quality service.

In this Agreement, the term "affiliates" means current and future affiliates of Bank, including, but not limited to, the following National City Corporation subsidiaries: National City Bank of Indiana, National City Bank of the Midwest, National City Bank of Pennsylvania, National City Bank of Southern Indiana, National City Home Loan Services, Inc., First Franklin Financial Corporation, National City Bank of Kentucky, National City Mortgage Co. and National City Mortgage Services Co.

**If you believe that we have information about you that is inaccurate or that we have reported or may report to a credit reporting agency information about you that is inaccurate, please notify us of the specific information that you believe is inaccurate by writing to National City, P O. Box 94982, Cleveland, Ohio 44101, Attn: Credit Bureau Disputes, Locator 7113.**

NOTICES. The following notices are given by Bank only to the extent not inconsistent with 12 U.S.C. Section 85 and related regulations and opinions, and/or the choice of law provision set forth herein (with respect to which Bank expressly reserves all rights). You acknowledge receipt of the following notices before becoming obligated:

If the Dwelling is located in California: Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of the Property

If the Dwelling is located in Colorado: If your payments are received after the due date, even if received before the date a late fee applies, you may owe additional and substantial money at the end of the credit transaction and there may be little or no reduction of principal. This is due to the accrual of daily interest until a payment is received.

If the dwelling is located in Connecticut: Your initial Draw Period will be 9 years 10 months and cannot be renewed for additional draw periods.

If the Dwelling is located in Florida: FLORIDA DOCUMENTARY STAMP TAX IN THE AMOUNT REQUIRED BY LAW HAS BEEN PAID OR WILL BE PAID DIRECTLY TO THE DEPARTMENT OF REVENUE, AND FLORIDA DOCUMENTARY STAMPS HAVE BEEN PLACED ON THE TAXABLE INSTRUMENTS AS REQUIRED BY CHAPTER 201, FLORIDA STATUTES.

If the Dwelling is located in Maryland: We elect Subtitle 9, Credit Grantor Open End Credit Provisions, of Title 12 of the Commercial Law Article of the Annotated Code of Maryland.

If the Dwelling is located in Minnesota. If the amount of this Loan is $100,000 or more, we elect Minn. Stat. § 334.01

If the Dwelling is located in Missouri. Oral agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt including promises to extend or renew such debt are not enforceable. To protect you (borrower(s)) and us (creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.

If the Dwelling is located in New York. YOU SHOULD CHECK WITH YOUR LEGAL ADVISOR AND WITH OTHER MORTGAGE LIEN HOLDERS AS TO WHETHER ANY PRIOR LIENS CONTAIN ACCELERATION CLAUSES WHICH WOULD BE ACTIVATED BY A JUNIOR ENCUMBRANCE.

DEFAULT IN THE PAYMENT OF THIS LOAN AGREEMENT MAY RESULT IN THE LOSS OF THE PROPERTY SECURING THE LOAN. UNDER FEDERAL LAW, YOU MAY HAVE THE RIGHT TO CANCEL THIS AGREEMENT. IF YOU HAVE THIS RIGHT, THE CREDITOR IS REQUIRED TO PROVIDE YOU WITH A SEPARATE WRITTEN NOTICE SPECIFYING THE CIRCUMSTANCES AND TIMES UNDER WHICH YOU CAN EXERCISE THIS RIGHT.

If the Dwelling is located in North Dakota. THIS OBLIGATION MAY BE THE BASIS FOR A PERSONAL ACTION AGAINST THE PROMISOR OR PROMISORS IN ADDITION TO OTHER REMEDIES ALLOWED BY LAW.

If the dwelling is located in Oregon: NOTICE TO THE BORROWER: Do not sign this loan agreement before you read it. The loan agreement may provide for the payment of a penalty if you wish to repay the loan prior to the date provided for repayment in the loan agreement.

If the Dwelling is located in Texas: THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

If the Dwelling is located in Vermont: NOTICE TO CO-SIGNER: YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN. IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU

COPY RECEIVED. You agree to be legally bound to all provisions of this Agreement. You acknowledge receipt of a completed copy of this Agreement, including important information below regarding your rights to dispute billing errors ("Your Billing Rights").

| LONE HALE | X _Lone Hale_ |
|---|---|
| TYPE OR PRINT NAME | SIGNATURE |
| | X |
| TYPE OR PRINT NAME | SIGNATURE |
| | X |
| TYPE OR PRINT NAME | SIGNATURE |
| | X |
| TYPE OR PRINT NAME | SIGNATURE |

Address of Dwelling: 1411 WELSH WAY RAMONA , California 92065

NHERA5 (Rev 06/13/2005)     -6-     
ERA-MULTI-NHV2_5



## YOUR BILLING RIGHTS – KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify Us In Case of Errors or Questions About your Bill**
If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information.
- Your name and Line number
- The dollar amount of the suspected error
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**Your Rights and Our Responsibilities After We Receive Your Written Notice**
We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Line. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

**Special Rule for Credit Card Purchases**
If you have a problem with the quality of property or services that you purchased with your Card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

(a)   You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address; and

(b)   The purchase price must have been more than $50.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

©2005 National City Corporation




**⊕PNC BANK**

## CERTIFICATE

The undersigned, Janet L. Deringer, Assistant Secretary of PNC Bank, National Association does hereby certify as follows:

1. National City Bank was a wholly owned subsidiary of National City Corporation.

2. Effective December 31, 2008, National City Corporation merged with and into The PNC Financial Services Group, Inc. and National City Bank became a wholly owned subsidiary of The PNC Financial Services Group, Inc.

3. Effective as of November 6, 2009, National City Bank and pursuant to approval granted by the United States Office of the Comptroller of the Currency (as evidenced by the official certification dated November 6, 2009 attached hereto as Exhibit "A"), was merged with and into PNC Bank, National Association.

4. PNC Bank, National Association is a duly organized and existing national banking association (Charter Number 1316) and wholly owned subsidiary of PNC Bancorp, Inc. (a wholly owned subsidiary of The PNC Financial Services Group, Inc.), having its main office located at 222 Delaware Avenue, Wilmington, Delaware 19801 and using federal Employer Identification Number 22-1146430.

IN WITNESS WHEREOF, the undersigned has hereunto set her hand and affixed the seal of this Association this 6th day of November, 2009.

*Janet L. Deringer* 
Janet L. Deringer

[SEAL: PNC BANK, NATIONAL ASSOCIATION]

Member of The PNC Financial Services Group
One PNC Plaza  249 Fifth Avenue  Pittsburgh  Pennsylvania  15222 2707

**EXHIBIT B**

M:\LGL\BOARD\CERT\NATIONAL CITY\NATIONAL CITY BANK.doc

-7-



| NIC Home | Institution Search | FBO Search | Top 50 BHCs |
|---|---|---|---|
| BHCPR Peer Reports | FAQ | | |

**Institution History for** 1900 EAST NINTH STREET BRANCH (259518)

5 institution history record(s) found.                                    Page 1

| Event Date | Historical Event |
|---|---|
| 1959-12-31 | NATIONAL CITY BANK located at EUCLID EAST 9TH ST, CLEVELAND, OH was **established** as a National Bank. |
| 1986-11-21 | NATIONAL CITY BANK **moved** to 1900 E. NINTH ST. CLEVELAND, OH. |
| 2009-11-07 | NATIONAL CITY BANK was **acquired** by PNC BANK, NATIONAL ASSOCIATION. |
| 2009-11-07 | NATIONAL CITY BANK was **renamed** to 1900 E NINTH ST BR and **moved** to 1900 EAST NINTH STREET CLEVELAND, OH and **changed** from National Bank to Domestic Branch of a Domestic Bank. |
| 2009-12-01 | Institution is **closed**. |

Page 1 of 1

NIC Home | FAQ | Help | Contact Us

-8-

FFIEC home | Federal Reserve Board home
Accessibility | Disclaimer | Privacy Policy

**National Information Center**
A repository of financial data and institution characteristics collected by the Federal Reserve System

| NIC Home | Institution Search | FBO Search | Top 50 BHCs | BHCPR Peer Reports |
| FAQ | | | | |
| Organization Hierarchy | Institution History | Institutions Acquired | Branch Locator | |

**PNC BANK, NATIONAL ASSOCIATION**
255 FIFTH AVENUE
PITTSBURGH, PA, UNITED STATES 152220000

Institution Type: National Bank

Primary Federal Regulator: OCC

RSSD ID: 817824
Routing Transit Number (RTN):       043000096
Activity: COMMERCIAL BANKING

Insurance: FDIC/DEPOSIT INSURANCE FUND
FDIC Certificate #: 6384

### Financial Data

This site does not provide financial data for commercial bank institutions. Please visit the FFIEC's PDD site for financial data.

NIC Home | FAQ | Help | Contact Us

—9—

Recording Requested By: National City Bank

Return To:

Record & Return to:
Group 9 Inc.
2005 Cabot Blvd West
Langhorne, PA 19047

Prepared By:
RICK FONTANA,
NATIONAL CITY BANK
1403 Corporate Center Parkway,
Santa Rosa Ca 95407

DOC # 2006-0208453

MAR 27, 2006   11:34 AM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J. SMITH, COUNTY RECORDER
FEES:          27.00
PAGES:            7           DA:    1

2006-0208453

6415

———— State of California ———— ———— Space Above This Line For Recording Data ————

# DEED OF TRUST
(With Future Advance Clause)

1. **DATE AND PARTIES.** The date of this Deed of Trust (Security Instrument) is March 6, 2006
   The parties and their addresses are:
   TRUSTOR:  LONE HALE and GEORGE T HALE
              1411 WELSH WAY, RAMONA, California, 92065

   ☐ If checked, refer to the attached Addendum incorporated herein, for additional Trustors, their signatures and acknowledgments.

   TRUSTEE: NATIONAL CITY BANK

   HALE
   MORTGAGEDEED

   LENDER: NATIONAL CITY BANK

   1032  XKMW63E

2. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debt (defined below) and Trustor's performance under this Security Instrument, Trustor irrevocably grants, conveys and sells to Trustee, in trust for the benefit of Lender, with power of sale, the following described property:
   EXHIBIT A ATTACHED

   TAX ID 282-342-37
   The property is located in San Diego ............................................. at ............................................
                                       (County)
   1411 WELSH WAY                    ,    RAMONA                   , California   92065
   ........(Address)........              ........(City)........                     ....(ZIP Code)....

   Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, ditches, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as "Property").

3. **MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time shall not exceed $ ....270,000.00...... . This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

4. **SECURED DEBT AND FUTURE ADVANCES.** The term "Secured Debt" is defined as follows:
   A. Debt incurred under the terms of all promissory note(s), contract(s), guaranty(ies) or other evidence of debt

CALIFORNIA - HOME EQUITY LINE OF CREDIT DEED OF TRUST (NOT FOR FNMA, FHLMC, FHA OR VA USE)                    (page 1 of 6)
Expere© ©1994 Bankers Systems, Inc., St. Cloud, MN Form OCP-REDT-CA 5/20/2005
VMP®-C465(CA) (0508)                    VMP Mortgage Solutions, Inc. (800)521-7291

4489  6182  8008  1032   EXHIBIT C

—10—

described below and all their extensions, renewals, modifications or substitutions. *(Include items such as borrowers' names, note or contract amounts, interest rates (whether variable), maturity dates, etc.)*

Maturity Date: 3/06/2036

B. All future advances from Lender to Trustor or other future obligations of Trustor to Lender under any promissory note, contract or guaranty, or other evidence of debt executed by Trustor in favor of Lender after this Security Instrument if this Security Instrument is specifically referenced on the evidence of other debt. If more than one person signs this Security Instrument, each Trustor agrees that this Security Instrument will secure all future advances and future obligations that are given to or incurred by any one or more Trustor, or any one or more Trustor and others. All future advances and other future obligations are secured by this Security Instrument even though all or part may not yet be advanced. All future advances and other future obligations are secured as if made on the date of this Security Instrument.

C. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

D. Performance of every obligation in this Security Instrument (including any subsequent instrument amending this Security Instrument) and any instrument now or later evidencing or securing any indebtedness secured by this Security Instrument.

In the event that Lender fails to provide any required notice of the right of rescission, Lender waives any subsequent security interest in Trustor's principal dwelling that is created by this Security Instrument.

5. **DEED OF TRUST COVENANTS.** Trustor agrees that the covenants in this section are material obligations under the Secured Debt and this Security Instrument. If Trustor breaches any covenant in this section, Lender may refuse to make additional extensions of credit and reduce the credit limit. By not exercising either remedy on Trustor's breach, Lender does not waive Lender's right to later consider the event a breach if it happens again.

**Payments.** Trustor agrees that all payments under the Secured Debt will be paid when due and in accordance with the terms of the Secured Debt and this Security Instrument.

**Prior Security Interests.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Trustor agrees to make all payments when due and to perform or comply with all covenants. Trustor also agrees not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written approval.

**Claims Against Title.** Trustor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Trustor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Trustor's payment. Trustor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Trustor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Trustor may have against parties who supply labor or materials to maintain or improve the Property.

**Property Condition, Alterations and Inspection.** Trustor will keep the Property in good condition and make all repairs that are reasonably necessary. Trustor shall not commit or allow any waste, impairment, or deterioration of the Property. Trustor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Trustor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Trustor will notify Lender of all demands, proceedings, claims, and actions against Trustor, and of any loss or damage to the Property. Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender shall give Trustor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property shall be entirely for Lender's benefit and Trustor will in no way rely on Lender's inspection.

**Authority to Perform.** If Trustor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Trustor appoints Lender as attorney in fact to sign Trustor's name or pay any amount necessary for performance. Lender's right to perform for Trustor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument.

**Leaseholds; Condominiums; Planned Unit Developments.** Trustor agrees to comply with the provisions of any lease if this Security Instrument is on a leasehold. If the Property includes a unit in a condominium or a planned unit development, Trustor will perform all of Trustor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

6417

**Condemnation.** Trustor will give Lender prompt notice of any pending or threatened action, by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Trustor authorizes Lender to intervene in Trustor's name in any of the above described actions or claims. Trustor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

**Insurance.** Trustor shall keep Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location. This insurance shall be maintained in the amounts and for the periods that Lender requires. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debt. The insurance carrier providing the insurance shall be chosen by Trustor subject to Lender's approval, which shall not be unreasonably withheld. If Trustor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Security Instrument.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "loss payee clause." Trustor shall immediately notify Lender of cancellation or termination of the insurance. Lender shall have the right to hold the policies and renewals. If Lender requires, Trustor shall immediately give to Lender all receipts of paid premiums and renewal notices. Upon loss, Trustor shall give immediate notice to the insurance carrier and Lender. Lender may make proof of loss if not made immediately by Trustor.

Unless otherwise agreed in writing, all insurance proceeds shall be applied to the restoration or repair of the Property or to the Secured Debt, whether or not then due, at Lender's option. Any application of proceeds to principal shall not extend or postpone the due date of the scheduled payment nor change the amount of any payment. Any excess will be paid to the Trustor. If the Property is acquired by Lender, Trustor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

**Financial Reports and Additional Documents.** Trustor will provide to Lender upon request, any financial statement or information Lender may deem reasonably necessary. Trustor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Trustor's obligations under this Security Instrument and Lender's lien status on the Property.

6. **WARRANTY OF TITLE.** Trustor warrants that Trustor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to irrevocably grant, convey and sell the Property to Trustee, in trust, with power of sale. Trustor also warrants that the Property is unencumbered, except for encumbrances of record.

7. **DUE ON SALE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, a transfer or sale of all or any part of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable.

8. **DEFAULT.** Trustor will be in default if any of the following occur:
   **Fraud.** Any Consumer Borrower engages in fraud or material misrepresentation in connection with the Secured Debt that is an open end home equity plan.
   **Payments.** Any Consumer Borrower on any Secured Debt that is an open end home equity plan fails to make a payment when due.
   **Property.** Any action or inaction by the Borrower or Trustor occurs that adversely affects the Property or Lender's rights in the Property. This includes, but is not limited to, the following: (a) Trustor fails to maintain required insurance on the Property; (b) Trustor transfers the Property; (c) Trustor commits waste or otherwise destructively uses or fails to maintain the Property such that the action or inaction adversely affects Lender's security; (d) Trustor fails to pay taxes on the Property or otherwise fails to act and thereby causes a lien to be filed against the Property that is senior to the lien of this Security Instrument; (e) a sole Trustor dies; (f) if more than one Trustor, any Trustor dies and Lender's security is adversely affected; (g) the Property is taken through eminent domain; (h) a judgment is filed against Trustor and subjects Trustor and the Property to action that adversely affects Lender's interest; or (i) a prior lienholder forecloses on the Property and as a result, Lender's interest is adversely affected.
   **Executive Officers.** Any Borrower is an executive officer of Lender or an affiliate and such Borrower becomes indebted to Lender or another lender in an aggregate amount greater than the amount permitted under federal laws and regulations.

9. **REMEDIES ON DEFAULT.** In addition to any other remedy available under the terms of this Security Instrument, Lender may accelerate the Secured Debt and foreclose this Security Instrument in a manner provided by law if Trustor is in default. In some instances, federal and state law will require Lender to provide Trustor with notice of the right to cure, or other notices and may establish time schedules for foreclosure actions.

At the option of the Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. Lender shall be entitled to, without limitation, the power to sell the Property.

If Lender elects to foreclose by exercise of the power of sale, Lender will declare the entire Secured Debts due and payable by delivering to Trustee this Security Instrument and any evidence of the Secured Debts, receipts and evidence of expenditures made and secured, as Trustee requires. When the legally prescribed time passes after Trustee or Lender duly records a notice of default, the Trustee, Lender or other person authorized to take the sale will give a notice of sale as required by law and will

Express® ©1994 Bankers Systems, Inc., St. Cloud, MN Form OCP-REDT-CA 5/20/2005
VMP®-C465(CA) (0508)

—12—

 (page of)

**6418**

cause the Property to be sold at the time and place fixed in the notice of sale. Lender may rescind any notice of default at any time before the Property's sale. Rescission will occur when Lender executes and records a notice of rescission that cancels any prior notice of default and any related acceleration of the Secured Debts. Lender's rescission will not waive any default then existing or subsequently occurring or preclude Lender exercising its remedies, including the power of sale, at another time.

The Property can be sold as a whole or in separate parcels and in any order that Trustee decides. The Property will be sold to the highest bidder for cash in lawful money of the United States, payable at sale time. The Property can be sold to anyone, including Trustor, Trustee or Lender. Trustee may postpone the sale of any part of the Property by public announcement at the time and place of this sale and afterwards at the time fixed by the preceding postponement. Upon any sale of the Property, Trustee will make and deliver a special or limited warranty deed that conveys the property sold to the purchaser or purchasers. Under this special or limited warranty deed, Trustee will covenant that Trustee has not caused or allowed a lien or an encumbrance to burden the Property and that Trustee will specially warrant and defend the Property's title to the purchaser or purchasers at the sale against all lawful claims and demand of all persons claiming by, through or under Trustee. The deed's recital of facts will be conclusive proof of the truthfulness of these facts.

The proceeds from the Property's sale will be applied to the sale expenses, Trustee's expenses, Lender's attorneys' fees due on Trustor's default, sums that Trustee or Lender paid for procuring a title search of the Property's title subsequent to the execution of this Security Instrument, all outstanding amounts due under this Security Instrument and the remainder to anyone legally entitled to the remaining amounts due.

The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require complete cure of any existing default. By not exercising any remedy on Trustor's default, Lender does not waive Lender's right to later consider the event a default if it happens again.

10. **EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** If Trustor breaches any covenant in this Security Instrument, Trustor agrees to pay all expenses Lender incurs in performing such covenants (including but not limited to advances and expenses described in the DEED OF TRUST COVENANTS section) or protecting its security interest in the Property. Such expenses include, but are not limited to, fees incurred for inspecting, preserving, or otherwise protecting the Property and Lender's security interest. These expenses are payable on demand and will bear interest from the date of payment until paid in full at the highest rate of interest in effect as provided in the terms of the Secured Debt. Trustor agrees to pay all costs and expenses incurred by Lender in collecting, enforcing or protecting Lender's rights and remedies under this Security Instrument. This amount may include, but is not limited to, attorneys' fees, court costs, and other legal expenses. To the extent permitted by the United States Bankruptcy Code, Trustor agrees to pay the reasonable attorneys' fees Lender incurs to collect the Secured Debt as awarded by any court exercising jurisdiction under the Bankruptcy Code. This Security Instrument shall remain in effect until released. Trustor agrees to pay for any recordation costs of such release.

11. **ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), and all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste" or "hazardous substance" under any Environmental Law.

    Trustor represents, warrants and agrees that:
    A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance is or will be located, stored or released on or in the Property. This restriction does not apply to small quantities of Hazardous Substances that are generally recognized to be appropriate for the normal use and maintenance of the Property.
    B. Except as previously disclosed and acknowledged in writing to Lender, Trustor and every tenant have been, are, and shall remain in full compliance with any applicable Environmental Law.
    C. Trustor shall immediately notify Lender if a release or threatened release of a Hazardous Substance occurs on, under or about the Property or there is a violation of any Environmental Law concerning the Property. In such an event, Trustor shall take all necessary remedial action in accordance with any Environmental Law.
    D. Trustor shall immediately notify Lender in writing as soon as Trustor has reason to believe there is any pending or threatened investigation, claim, or proceeding relating to the release or threatened release of any Hazardous Substance or the violation of any Environmental Law.

12. **ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Trustor will not be required to pay to Lender funds for taxes and insurance in escrow.

13. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Security Instrument are joint and individual. If Trustor signs this Security Instrument but does not sign an evidence of debt, Trustor does so only to mortgage Trustor's interest in the Property to secure payment of the Secured Debt and Trustor does not agree to be personally liable on the Secured Debt. The duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Trustor and Lender.






**6419**

14. **SEVERABILITY; INTERPRETATION.** This Security Instrument is complete and fully integrated. This Security Instrument may not be amended or modified by oral agreement. Any section in this Security Instrument, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section of this Security Instrument cannot be enforced according to its terms, that section will be severed and will not affect the enforceability of the remainder of this Security Instrument. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Security Instrument are for convenience only and are not to be used to interpret or define the terms of this Security Instrument. Time is of the essence in this Security Instrument.

15. **SUCCESSOR TRUSTEE.** Lender, at Lender's option, may from time to time remove Trustee and appoint a successor trustee without any other formality than the designation in writing. The successor trustee, without conveyance of the Property, shall succeed to all the title, power and duties conferred upon Trustee by this Security Instrument and applicable law.

16. **NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Security Instrument, or to any other address designated in writing. Notice to one trustor will be deemed to be notice to all trustors. Lender and Trustor request that copies of any notice of default or notice of sale under a superior security instrument be sent to Lender and Trustor at the addresses listed in the DATE AND PARTIES section.

17. **WAIVERS.** Except to the extent prohibited by law, Trustor waives all appraisement or marshalling of assets relating to the Property.

18. **SPOUSE'S SEPARATE PROPERTY.** Any Trustor who is a married person expressly agrees that recourse may be had against his or her separate property.

19. **LINE OF CREDIT.** The Secured Debt includes a revolving line of credit. Although the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released.

20. **APPLICABLE LAW.** This Security Instrument is governed by the laws as agreed to in the Secured Debt, except to the extent required by the laws of the jurisdiction where the Property is located, and applicable federal laws and regulations.

21. **RIDERS.** The covenants and agreements of each of the riders checked below are incorporated into and supplement and amend the terms of this Security Instrument. [Check all applicable boxes]
    ☐ Assignment of Leases and Rents   ☐ Other ..................................................................

22. ☐ **ADDITIONAL TERMS.**

23. **REQUEST FOR NOTICE.** In accordance with Section 2924b, Civil Code, request is hereby made that a copy of any notice of default and a copy of any notice of sale under the deed of trust (or mortgage) recorded ..................................... , .................................. , in book ................ page .......................... , records of ................................... County, (or filed for record with recorder's serial number ........................................................................... County) California, executed by ..................................... , ............................................................................................. as trustor (or mortgagor) in which .............................................................................. , is named as beneficiary (or mortgagee) and .......................................................................... as trustee be mailed to:
Name ........................................................................................................................................ at
Address .................................................................................................................................... .
NOTICE: A copy of any notice of default and of any notice of sale will be sent only to the address contained in this recorded request. If your address changes, a new request must be recorded.    Signature on behalf of the requester named above:
Signature ..........................................................................
(Include the requester's name, by the signer, among those acknowledging below, or use a separate acknowledgment form.)

*(page 5 of 6)*

Expere® © 1994 Bankers Systems, Inc., St. Cloud, MN Form OCP-REDT-CA 5/20/2005
VMP-C465(CA) (0508)

—14—

6420

SIGNATURES: By signing below, Trustor agrees to the terms and covenants contained in this Security Instrument and in any attachments. Trustor also acknowledges receipt of a copy of this Security Instrument on the date stated on page 1.

_____ 3/6/06      _____ 3/6/06
(Signature) LONE HALE          (Date)      (Signature) GEORGE T HALE       (Date)

ACKNOWLEDGMENT:
STATE OF California,
COUNTY OF San Diego          } ss.
On this Sixth day of March, 2006 before me Kimberly Childers
a notary public personally appeared Lone Hale and George T Hale

~~personally known to me (or~~ proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) ~~is~~/are subscribed to the within instrument and acknowledged to me that ~~he/she~~/they executed the same in ~~his/her~~/their authorized capacity(ies), and that by ~~his/her~~/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.

(Seal)

Signature _____
Name (typed or printed) Kimberly Childers
My commission expires: July 27, 2006

KIMBERLY CHILDERS
COMM #1366755
NOTARY PUBLIC • CALIFORNIA
SAN DIEGO COUNTY
Commission Expires July 27, 2006

---

**REQUEST FOR FULL RECONVEYANCE**

**To Trustee:** The undersigned is the holder of the note or notes secured by this Deed of Trust, which was recorded in the office of the Recorder of .................................................................................................. County, State of California, in book ........................, page .................... of official records. Said note or notes, together with all other indebtedness secured by this Deed of Trust, have been paid in full. You are hereby directed to cancel said note or notes and this Deed of Trust, which are delivered hereby, and to reconvey, without warranty, all the estate now held by you under this Deed of Trust to the person or persons legally entitled thereto.
Dated: ....................................................................................

Assessor's Identification Number ..........................................................................

Express ©1994 Bankers Systems, Inc., St. Cloud, MN Form OCP-REDT-CA 5/20/2005         —15—         (page 6 of 6)
VMP-C465(CA) (0508)

6421

Exhibit A

NAME(S):   LONE HALE

LONG LEGAL: LYING AND BEING LOCATED IN THE UNINCORPORATED AREA, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA; ALL THAT CERTAIN PARCEL OR TRACT OF LAND KNOWN AS:

LOT 2 OF COUNTY OF SAN DIEGO TRACT NO. 5136-1, IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 14490, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, NOVEMBER 18, 2002.

MORTGAGEDEED_A



TAX MAP#:   282-342-37

-16-